## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BHC INTERIM FUNDING II, L.P., and BHC INTERIM FUNDING III, L.P.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for WATERFIELD BANK,**<br><br>**Defendant.** | **Civil Action 10-1952 (BJR)** |

## MEMORANDUM OPINION

Plaintiffs BHC Interim Funding II, L.P. and BHC Interim Funding III, L.P. (collectively, "BHC") bring this suit against the Federal Deposit Insurance Corporation as receiver for Waterfield Bank. Defendant FDIC has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Upon consideration of the motion [Dkt. #10], and the opposition thereto, the Court concludes that the motion must be granted as to one claim. The court dismisses the remaining claims without prejudice for lack of subject matter jurisdiction.

## I. STATUTORY BACKGROUND

"Passed to 'enable the FDIC . . . to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country,'" *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1141 (D.C. Cir. 2011) (quoting *Freeman v. FDIC*, 56 F.3d 1394, 1398 (D.C. Cir. 1995)), "[t]he Financial Institutions Reform, Recovery and Enforcement Act of 1989 ('FIRREA') gives the receivers of failed savings and loan institutions wide-ranging powers to consolidate and

liquidate those institutions," *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 241 (D.C. Cir. 1995). Upon its appointment as receiver, the FDIC acquires "all rights, titles, powers, and privileges of the insured depository institution," 12 U.S.C. § 1821(d)(2)(A)(i), along with the duty—limited in certain ways not relevant here—to "pay all valid obligations of the insured depository institution," 12 U.S.C. § 1821(d)(2)(H).

The FDIC pays those obligations through an administrative claims process. *See* 12 U.S.C. §§ 1821(d)(3)–(13). FIRREA requires the FDIC to both publish, 12 U.S.C. § 1821(d)(3)(B), and mail, *id.* § 1821(d)(3)(C), notice to the failed institution's creditors, setting "a date by which claims must be presented, not less than 90 days after publication," *Freeman*, 56 F.3d at 1399. The FDIC has 180 days after a claim is filed to decide whether to pay it or disallow it. 12 U.S.C. § 1821(d)(5)(A). If the FDIC denies the claim or fails to rule promptly, the claimant may seek judicial review. *Id.* § 1821(d)(6)(A). But unless a claim is first presented to the FDIC, no court has jurisdiction over it, *see id.* § 1821(d)(13)(D), because "FIRREA is strict in its demand that claimants first obtain an administrative determination." *Office & Prof'l Emps. Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 65 (D.C. Cir. 1992).

## II.  FACTUAL BACKGROUND

When deciding a 12(b)(6) motion "a court construes the complaint liberally in the plaintiff's favor, accepting as true all of the factual allegations contained in the complaint, with the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) (citations, brackets, and quotation marks omitted); *see also Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253–54 (D.C. Cir. 2008); *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006). Courts may not

consider "matters outside the pleadings" without converting the 12(b)(6) motion into "one for summary judgment under Rule 56," FED. R. CIV. P. 12(d), but documents attached to the complaint or incorporated by reference therein are not outside of the pleadings. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). Documents "appended to [a] motion to dismiss" may also be considered without converting to summary judgment if they are "referred to in the complaint," "integral" to a claim, and their "authenticity is not disputed." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Bearing those standards in mind, the Court summarizes the allegations underlying this complaint.

In 2008, BHC made two loans to Affinity Financial Corporation ("Affinity"), totaling $14.5 million. Compl. ¶¶ 10–11. Each loan was secured by a first priority lien on the assets of Affinity, *id.* ¶ 12, and guaranteed by Waterfield Financial Services ("Waterfield Financial"), a wholly-owned subsidiary of Affinity. *Id.* ¶¶ 1, 13. The Waterfield Financial guarantees were secured by a first priority lien on the company's "[d]eposit [a]ccounts (as defined in the UCC but excluding deposits made by customers of Waterfield Financial Services, Inc. . . . and held at other banks)," as well as its "[g]eneral [i]ntangibles." *Id.*, Ex. A at 47–48 (Continuing Unconditional Guarantee of Waterfield Financial (Apr. 28, 2008)), 57–58 (Continuing Unconditional Guarantee of Waterfield Financial (Jan. 15, 2008)). BHC perfected its security interest in those assets by filing U.C.C. financing statements with the Indiana Secretary of State. *Id.* ¶ 14; *id.*, Ex. A at 65 (U.C.C. Financing Statement (Apr. 28, 2008)); *id.* at 73 (U.C.C. Financing Statement (Jan. 15, 2008)). In March 2010, Affinity defaulted on its loan and Waterfield Financial defaulted on its guarantees. *Id.* ¶¶ 42–43.

3

The primary asset of both Affinity and its subsidiary Waterfield Financial was a stream of income from the business of selling financial products and services to the members of "affinity groups" such as unions and other membership organizations.  Waterfield Financial[1] would enter into a licensing agreement with a group, then market products such as group-branded checks and ATM cards and, most importantly, bank accounts with favorable interest rates to that group's members.  *Id.* ¶ 16.  Waterfield Financial would contract with banks to accept the deposits of its customers, which were then held in single pooled account at each participating bank.  The participating banks would pay a fee to Waterfield Financial based on the average balance in the pooled account.  *Id.* ¶¶ 17–18.  Banks holding such accounts would not, however, interact directly with Waterfield Financial customers—all customer service, including the processing of deposits and withdrawals and the associated record keeping, was performed by another bank.  That bank would send customers' deposits to the other, larger banks in accordance with Waterfield Financial's instructions.  *Id.* ¶ 19.

In early 2008, Affinity acquired Waterfield Bank, which assumed the customer service and bookkeeping role described above and also maintained some customer deposits itself.  *Id.* ¶ 21.  Under the agreement governing their deposit accounts, customers gave Waterfield Bank "the authority to determine whether it will retain [the customer's] funds in a direct deposit relationship" with the customer.  Def.'s Mot. for Summ. J., Ex. 1 (Waterfield Bank, Deposit

---

[1] This role was first performed by Affinity itself, *see* Compl. ¶¶ 16–19, but in approximately February 2007, before the loans that animate this case were made, Affinity assigned all of its rights in the business to Waterfield Financial.  *Id.* ¶ 20.

Account Terms and Conditions (Sept. 2009)) ("Customer Agreement"), at 1.[2]  If Waterfield

Bank chose not to maintain the funds, it would "notify [Waterfield Financial]," which the

customer appointed as her "special attorney-in-fact and agent ('Agent') to place [the customer's]

deposit in a sub-account at another financial institution (a 'Participating Bank')." *Id.*  Each

customer authorized Waterfield Bank "to transfer [that customer's] deposit to a Participating

Bank at the direction of [Waterfield Financial]," and further "authorize[d] and direct[ed] each

Participating Bank to act in accordance with instructions given by the Agent." *Id.*  The customer

agreed that, if her deposit was transferred, "the Participating Banks [would] pay a gross interest

amount to [Waterfield Bank], for the benefit of [Waterfield Financial], who, in turn, [would]

instruct [Waterfield Bank] to deduct its fee and deposit the remainder in [the customer's]

account." *Id.*  Finally, each customer agreed that Waterfield Bank and Waterfield Financial

could "assign this Agreement to any successor or other person or entity . . . without [the

customer's] prior knowledge or consent." *Id.* at 2.

   When Waterfield Financial guaranteed the loans that BHC made to Affinity, and gave as

security for that guarantee a lien in its general intangibles, its largest intangible asset was its

right to the fees described above.  Compl. ¶ 22.  Through February 2010, those fees produced

enough revenue to enable Affinity (the parent of Waterfield Financial) to make its monthly loan

payments to BHC of approximately $145,000.  *Id.* ¶ 23.

   In late February 2010, the Office of Thrift Supervision ("OTS"), the regulatory body that

then oversaw savings and loan associations, determined that Waterfield Bank was

---

[2] The Court considers this document because the complaint incorporates it by reference, Compl. ¶ 26 (referring to the "Waterfield Bank Deposit Account Terms and Conditions"), and there is no dispute as to its authenticity.  *See Kaempe*, 367 F.3d at 965.

undercapitalized.  OTS "threatened [Waterfield Financial] and its principals with unspecified legal action if Affinity did not cause [Waterfield Financial] to immediately assign to [Waterfield Bank]" the contracts underlying the pooled-account scheme and "all rights to the [pooled accounts] held by [Waterfield Financial] as agent for its customers."  *Id.* ¶ 24.  An assignment agreement between Waterfield Financial and Waterfield Bank was completed by March 2, 2010. *See id.*, Ex. A at 8–15 (the "Assignment Agreement").  In its initial recitals, the assignment agreement stated that:

> [Waterfield Bank] has been, by letter dated February 26, 2010, directed ("the Directive") by the Office of Thrift Supervision, Department of the Treasury . . . to accept the assignment of all deposit account agreements held by [Waterfield Financial] and to ensure "that the account titles at the participating institutions are changed from '[Waterfield Financial] as agent for its customers' to 'Waterfield Bank as agent for its customers,[']" pursuant to the Waterfield Bank Deposit Account Terms and Conditions . . . .

> [A]s a result of the Directive, [Waterfield Financial] desires to transfer to [Waterfield Bank] (x) its full right, title and interest in and to all deposit accounts opened by retail customers who appointed [Waterfield Financial] as their special attorney-in-fact and agent . . . under the Waterfield Bank Deposit Account Terms and Conditions . . . on all [Waterfield Financial] Banking Centers previously or now owned and/or operated by [Waterfield Financial] (the "Agency Relationships"), and (y) its authority to act as Agent for all of its retail customers in connection with certain deposit accounts listed on Schedule A . . . (the "Agency Deposits") . . . .

*Id.* at 8.  The "Assignment and Assumption" clause provided that:

> Effective immediately upon execution of this Agreement by both of the parties hereto and the receipt of all necessary third party consents, the receipt of which from the OTS below is hereby acknowledged, [Waterfield Financial] hereby . . . assigns . . . to [Waterfield Bank], its successors and assigns forever, all of [Waterfield Financial's] rights, title and interest . . . in and to all and any of [Waterfield Financial's] rights, costs and obligations under, pursuant to and arising out of the Agency Relationships and the Agency Deposits, as fully and entirely as the same would have been held and enjoyed by [Waterfield Financial] as if this assignment had not been made . . . and [Waterfield Bank] covenants and agrees to discharge, perform and comply with, and to be bound by, all the terms,

6

conditions, provisions, obligations, covenants and duties of [Waterfield Financial] in connection with all and any of [Waterfield Financial's] rights and obligations under, pursuant to and arising out of the Agency Relationships and the Agency Deposits . . . .

*Id.* at 8–9.  As part of the assignment agreement, Waterfield Financial "represent[ed] and warrant[ed] that . . . it [had] all requisite corporate power and authority to execute and deliver this Agreement . . . subject to its agreements with BHC Interim Funding II, LLC and BHC Interim Funding III, LLC."  *Id.* at 9.

Shortly after this agreement was signed, the Office of Thrift Supervision took control of Waterfield Bank and appointed the FDIC as receiver.  The FDIC cancelled all of the pooled deposit accounts that had formerly been controlled by Waterfield Financial and returned the funds to individual customers.  Compl. ¶ 37.  BHC sent default notices to Affinity and Waterfield Financial, stating that as of the date of the closing of Waterfield Bank, Affinity was indebted to BHC for the full amount of each loan, plus interest and other fees and costs.  *Id.* ¶ 42.  Neither Affinity nor Waterfield Financial has made any loan payments since that date.  *Id.* ¶ 43.

BHC filed two claims with the FDIC, each for an "[a]mount due to claimant based on indebtedness of Waterfield Financial Services, Inc. to claimant which was assumed by Waterfield Bank pursuant to the terms of the Assignment Agreement."  *Id.*, Ex. A at 5, 15.  The first claim was for $9,369,949.76, *id.* at 5, and the second for $5,486,986.30, *id.* at 15.  The FDIC denied the claims, on the grounds that they had not "been proven to the satisfaction of the Receiver."  Compl. ¶ 37; *id.* at Ex. B.  This suit followed.

The complaint includes five claims for relief.  The first claim requests a declaratory judgment that the assignment agreement between Waterfield Financial and Waterfield Bank was void when signed, and therefore that the FDIC did not validly take title to "the deposits in those

7

accounts" when it was appointed as receiver.  The first claim also requests an award of damages

to BHC for the amount owed by Affinity.  Compl. ¶¶ 47–52.  The second claim alleges that the

assignment of contractual rights to Waterfield Bank was a fraudulent conveyance, and seeks an

award for the value of the contractual rights.  *Id.* ¶¶ 54–60.  The third claim alleges that, if the

assignment was valid, Waterfield Bank (and the FDIC as its receiver) assumed Waterfield

Financial's obligations as a guarantor of BHC loans along with its contractual rights, and is

therefore liable to BHC for the outstanding loan balance.  *Id.* ¶¶ 62–69.  The fourth claim alleges

that BHC had a perfected security interest in the assigned contractual rights, that the FDIC

violated a statutory prohibition against "avoiding a legally enforceable or perfected security

interest in any of the assets of any depository institution," 12 U.S.C. § 1821(e)(12), and that the

receiver is therefore liable to BHC for the value of its security interest.  Compl. ¶¶ 71–78.  The

final claim alleges that the FDIC unlawfully took BHC property without just compensation when

it cancelled the pooled deposit accounts.  *Id.* ¶ 80.

### III. JURISDICTION

"Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of

Am.*, 511 U.S. 375, 377 (1994).  Because "the inferior courts of the United States . . . are

creatures of statute and possess no jurisdiction except as afforded by congressional enactment,"

*Owens v. Republic of Sudan*, 531 F.3d 884, 887 (D.C. Cir. 2008), "the district courts may not

exercise jurisdiction absent a statutory basis."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545

U.S. 546, 552 (2005).  Because no court may act beyond its authority, "subject matter

jurisdiction 'is, of necessity, the first issue for an Article III court,'"  *Loughlin v. United States*,

393 F.3d 155, 171 (D.C. Cir. 2004) (quoting *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549

(D.C. Cir. 1981)), and federal courts "are obliged always to ascertain whether they have subject matter jurisdiction over the litigation before them, even when the parties prefer to ignore the question," *Reynolds v. Sheet Metal Workers, Local 102*, 702 F.2d 221, 223 (D.C. Cir. 1981); *see also Athens Cmty. Hosp., Inc. v. Schweiker*, 686 F.2d 989, 992 (D.C. Cir. 1982) ("It is axiomatic that subject matter jurisdiction may not be waived, and that courts may raise the issue *sua sponte*."). The Court therefore begins its analysis by examining its authority to hear this suit.

BHC identifies FIRREA as the primary basis of subject matter jurisdiction over its claims. It is clear that FIRREA "provides for administrative determination of 'any claim against a depository institution for which the Corporation is receiver' and thereafter for adjudication in district court." *Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1200 (D.C. Cir. 1998) (quoting 12 U.S.C. § 1821(d)(6)(A)(i)). But several of BHC's claims are instead arguably "relating to [an] act or omission of . . . the [Federal Deposit Insurance] Corporation as receiver," 12 U.S.C. § 1821(d)(13)(D)(ii), and there is disagreement among the circuits as to whether such claims must be submitted for administrative determination before being brought in federal court. The D.C. Circuit has not resolved this issue,[3] although it has "construed the [administrative] claims process broadly where either the failed depository institution or the FDIC-as-receiver might be held legally responsible to pay or otherwise resolve the asserted claim." *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d at 1143 (referring to *Freeman*, 56 F.3d at 1400–01; *Office & Prof'l Emps. Int'l Union*, 962 F.2d at 67). Of the six circuits that have spoken to the question, five require plaintiffs to submit for administrative determination claims based upon the FDIC's conduct as

---

[3] *See Auction Co.*, 141 F.3d at 1201. The Ninth Circuit has incorrectly suggested that the D.C. Circuit subjects such claims to FIRREA exhaustion. *McCarthy v. FDIC*, 348 F.3d 1075, 1080 (9th Cir. 2003).

receiver.  *See Vill. of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 387 (6th Cir. 2008);

*McCarthy v. FDIC*, 348 F.3d 1075, 1081 (9th Cir. 2003) (joining "the majority of courts in

holding that claimants . . . who challenge conduct by the FDIC as receiver[ ] must exhaust

administrative remedies before seeking judicial review"); *Stamm v. Paul*, 121 F.3d 635, 639–42

(11th Cir. 1997); *Home Capital Collateral, Inc. v. FDIC*, 96 F.3d 760, 763–64 (5th Cir. 1996);

*Hudson United Bank v. Chase Manhattan Bank*, 43 F.3d 848, 848–49 (3d Cir. 1994).  Only the

Tenth Circuit does not.  *See Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269,

1272–75 (10th Cir. 1994).  In analyzing its jurisdiction over claims against the FDIC for its

conduct as receiver, this Court adopts the majority rule that such claims must be exhausted.

Turning to the complaint in this case, it is clear that BHC presented its third claim to the

receiver as required by FIRREA.  In that claim, BHC alleges that Waterfield Bank assumed

Waterfield Financial's obligations as a guarantor of the loans from BHC to Affinity, and that the

FDIC as receiver for Waterfield Bank is therefore liable to BHC for the outstanding loan

balance.  Compl. ¶¶ 62–69.  BHC submitted to the FDIC two proofs of claim for an "[a]mount

due to claimant based on indebtedness of Waterfield Financial Services, Inc. to claimant which

was assumed by Waterfield Bank pursuant to the terms of the Assignment Agreement."  Compl.,

Ex. A at 5, 15.  As BHC explained in a letter accompanying its claims, "because the Assignment

Agreement provides that all of WFS' obligations under, pursuant to or arising out of the Agency

Relationships and the Agency Deposits are assumed by the Bank, the Bank has assumed the

obligations due to BHC and is responsible for satisfaction of such obligations which are more

fully set forth in the attached Proofs of Claims."  *Id.* at 4.  The FDIC rejected that claim and

BHC brought a timely suit in this court, which therefore has jurisdiction to hear the claim.

10

But BHC did not present its first, second, fourth, and fifth claims to the FDIC.  Those claims request a declaratory judgment that the assignment from Waterfield Financial to Waterfield Bank was *void ab initio*;[4] that BHC has a right to the assigned assets on the theory that they were fraudulently conveyed; that BHC has a valid security interest in those same assets; and, finally, that the FDIC effected an unconstitutional taking of property without just compensation by emptying the pooled deposit accounts held at other banks and returning the funds to customers.  These claims are all distinct from the claim that BHC presented to the FDIC.  The third claim does not, as these new claims do, require the FDIC to assess the value of the transferred contract rights.  Nor does it require the FDIC to determine the scope and validity of BHC's security interest in those rights, as at least some of these new claims do.  "Where . . . a [FIRREA] complaint alleges entirely new legal theories that are different than those reflected in the administrative proof of claim, the Court is without subject matter jurisdiction to consider the new causes of action."  *Jahn v. FDIC*, 2011 WL 6250865, at *9 (D.D.C. Dec. 15, 2011) (dismissing claims for civil conspiracy and conversion because only a claim for fraudulent transfer was submitted to the receiver); *see also McGlothin v. Resolution Trust Corp.*, 913 F. Supp. 15, 18–19 (D.D.C. 1996) (dismissing claims for negligence and breach of contract because only a claim for fraudulent inducement was submitted to the receiver); *Aljaf Assocs. Ltd. P'ship v. FDIC*, 879 F. Supp. 515, 517–18 (E.D. Pa. 1995) (dismissing fraud claim because it was not

---

[4] Claims for a declaratory judgment are at least subject to FIRREA's exhaustion requirement, *see Tri-State Hotels, Inc. v. FDIC*, 79 F.3d 707, 714–15 (8th Cir. 1996); *Nat'l Union Fire Ins. Co. v. City Savings, F.S.B.*, 28 F.3d 376, 392 (3rd Cir. 1994), if not barred entirely.  *Auction Co. of Am.*, 141 F.3d at 1200 n.2 (noting that "it may well be that Congress intended to entirely prevent parties from maintaining declaratory judgment actions against the receiver").

among the claims submitted to the receiver); *Brown Leasing Co. v. FDIC*, 833 F. Supp. 672, 674–76 (N.D. Ill. 1993) (dismissing claims for conversion and breach of contract because only a claim for breach of other agreements was submitted to the receiver); *Coleman v. FDIC*, 826 F. Supp. 31, 32 (D. Mass. 1993) ("This Court . . . has no jurisdiction over claims and theories of recovery in the Amended Complaint that were not asserted in the original Complaint," which was submitted to the receiver, because "no court may exercise jurisdiction over any claim against the FDIC as receiver unless the claimant has first submitted its claim to the FDIC administrative claim process."); *Hibyan v. FDIC*, 812 F. Supp. 271, 275 (D. Mass. 1993) (dismissing claims based on one contractual provision because only another contractual provision was presented to the receiver as the basis for a claim).[5]  Because BHC's first, second, fourth, and fifth claims were not submitted to the administrative claims process, "no court shall have jurisdiction over" them.  *See* 12 U.S.C. § 1821(d)(13)(D).  Accordingly, the Court dismisses those claims for lack of subject matter jurisdiction and turns to the merits of the remaining claim.

## IV.  MOTION TO DISMISS PLAINTIFF'S THIRD CLAIM

Under Rule 12(b)(6), a defendant may move to dismiss a complaint, or a claim therein, for failure to state a claim upon which relief may be granted.  FED. R. CIV. P. 12(b)(6).  Such a motion tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C.

---

[5]      BHC's suggestion that the Court could find a jurisdictional basis in 28 U.S.C. § 1331 does not alter this conclusion.  A district court's federal question jurisdiction is often limited by the requirement that a plaintiff first exhaust her administrative remedies.  *See, e.g.*, *Califano v. Sanders*, 430 U.S. 99, 104 n.3 (1977) (noting that section 205(h) of the Social Security Act, 42 U.S.C. § 405(h) "has been held . . . to foreclose jurisdiction under the general grant of federal-question jurisdiction, 28 U.S.C. § 1331" and to require claims to be first exhausted at the administrative level).

Cir. 2002).  To survive it, the complaint must allege facts sufficient to at least "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555).

In its third claim, BHC alleges that Waterfield Bank assumed Waterfield Financial's obligations as a guarantor of the loans from BHC to Affinity, and that the FDIC as receiver for Waterfield Bank stands in the bank's shoes and is therefore liable to BHC for the outstanding loan balance.  It grounds this claim in the assignment agreement, a contract between Waterfield Financial and Waterfield Bank.  The FDIC argues that this claim must fail because the assignment agreement does not purport to transfer those obligations.

Under California law, which governs the assignment agreement, *see* Assignment Agreement at 10, "[w]hether language in a contract is ambiguous is a question of law," and therefore appropriate for determination on a motion to dismiss.  *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718 P.2d 920, 925 (Cal. 1986).  Where the terms of a contract "are plain and unambiguous, the courts have a duty to enforce the contract as agreed upon by the parties." *Travelers Ins. Co. v. Nat'l Union Fire Ins. Co.*, 255 Cal. Rptr. 727, 731 (Cal. Ct. App. 1989) (quoting *Hackenthal v. Nat'l Cas. Co.*, 234 Cal. Rptr. 853, 856 (Cal. Ct. App. 1987)).  The language of a contract is to be "construed in light of the objectives and fundamental purposes of the parties to the agreement," *Roden v. AmerisourceBergen Corp.*, 113 Cal. Rptr. 3d 20, 46 (Cal. Ct. App. 2010) (quoting *Leo F. Piazza Paving Co. v. Found. Constructors, Inc.*, 177 Cal. Rptr. 268, 273 (Cal. Ct. App. 1981)), and each clause must be read in light of the others, *see* CAL. CIV.

CODE § 1641 (West 2012) ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

By signing the assignment agreement, Waterfield Bank agreed to "discharge, perform and comply with, and to be bound by, all the terms, conditions, provisions, obligations, covenants and duties of [Waterfield Financial] in connection with all and any of [Waterfield Financial's] rights and obligations under, pursuant to and <u>arising out of the Agency Relationships and the Agency Deposits</u> . . . ."  Assignment Agreement at 9 (emphasis added). The "Agency Relationships" and "Agency Deposits" were defined in the recitals, which provided that:

> [Waterfield Financial] desires to transfer to [Waterfield Bank] (x) its full right, title and interest in and to all deposit accounts opened by retail customers who appointed [Waterfield Financial] as their special attorney-in-fact and agent . . . under the Waterfield Bank Deposit Account Terms and Conditions . . . on all [Waterfield Financial] Banking Centers previously or now owned and/or operated by [Waterfield Financial] (the "Agency Relationships"), and (y) its authority to act as Agent for all of its retail customers in connection with certain deposit accounts listed on <u>Schedule A</u> . . . (the "Agency Deposits") . . . .

*Id.* at 8.  The "Agency Relationships" are therefore constituted by the deposit agreements between Waterfield Bank and its customers, while the "Agency Deposits" are the pooled deposit accounts that Waterfield Financial established on behalf of those customers.  BHC argues that the Waterfield Financial Guarantees were "obligations . . . arising out of the Agency Relationships and the Agency Deposits," *id.* at 9, because "no such obligation would have existed without those Agency Relationships."  Pls.' Mem.' in Opp. at 18.  The Court understands this somewhat puzzling formulation to assert that BHC would not have loaned money to Affinity—and Waterfield Financial would have had no debt to guarantee—without the revenue stream produced by the Agency Relationships.  The guarantees, on this account, resulted from

14

the Agency Relationships and therefore arose out of them.  *See* BLACK'S LAW DICTIONARY 123

(9th ed. 2009) (defining "arise" as "1. To originate; to stem (from) . . . . 2. To result (from)

. . . .").

      Perhaps BHC would not have loaned money to Affinity without Waterfield Financial's

guarantee, and perhaps that guarantee was only of value because of the income stream that

Waterfield Financial received from the Agency Relationships and Agency Deposits.  But that

does not mean that the guarantee arose out of those Relationships and Deposits.  If Waterfield

Financial had rented water coolers, and the bottled water company was only willing to do

business with Waterfield Financial because of its income stream, would we say that the water

cooler lease was an obligation that arose out of that income stream?  Like that lease, the

guarantee was an obligation independent of the Agency Relationships and Agency Deposits and

the income that they produced.  The language of the assignment agreement makes clear that the

only transfer made to Waterfield Bank was the contractual relationship between Waterfield

Financial and its customers; there is no reason to conclude that the guarantee of an unrelated loan

was transferred as well.

      The assignment agreement clearly states that it was created to transfer the Agency

Relationships and the Agency Deposits from Waterfield Financial to Waterfield Bank.

Waterfield Financial, the Agreement recites, "desire[d] to transfer to [Waterfield Bank] (x) its

full right, title and interest in and to all deposit accounts opened by retail customers who

appointed [Waterfield Financial] as their special attorney-in-fact and agent . . . under the

Waterfield Bank Deposit Account Terms and Conditions . . . and (y) its authority to act as Agent

for all of its retail customers in connection with certain deposit accounts . . . ."  Waterfield Bank,

in turn, "desire[d] to accept the assignment of both the Agency Relationships and the Agency Deposits." *Id.*  Moreover, the agreement makes it clear that the transfer was motivated by a direction issued by the Office of Thrift Supervision, which would have had no interest in Waterfield Bank—which was failing at the time the agreement was signed—further burdening itself.  Finally, the phrase "arising out of" does not occur in a vacuum.  Rather, Waterfield Bank agreed to assume the "rights and obligations under, pursuant to and arising out of the Agency Relationships and the Agency Deposits."  Read in the context of the entire agreement, this language was unambiguously intended simply to transfer those relationships and deposits in their entirety—and not, as BHC argues, to transfer all of Waterfield Financial's obligations that could be causally linked to them.  The Court therefore dismisses BHC's third claim.

## V.  CONCLUSION

The issue of subject matter jurisdiction was not raised in the briefs or at oral argument. If either party believes that there are authorities that should be brought to the Court's attention, the Court invites that party to brief its argument on a motion for reconsideration.  But for the reasons stated above, the FDIC's motion to dismiss is hereby **GRANTED** as to BHC's third claim, and the remaining claims hereby **DISMISSED** without prejudice for lack of subject matter jurisdiction.  BHC may refile its claims after it has presented them to the receiver for determination.

**SO ORDERED** this 30th day of March 2012.

Barbara Jacobs Rothstein
United States District Judge